

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00409-CR

Christopher **CASTORENO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CR2508
Honorable Ron Rangel, Judge Presiding

Opinion by:     Sandee Bryan Marion, Chief Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Patricia O. Alvarez, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: February 27, 2019

AFFIRMED

A jury found appellant Christopher Castoreno ("Castoreno") guilty of six counts of trafficking a child, enhanced by a prior conviction, and the trial court sentenced Castoreno to imprisonment for thirty years for each count, with the sentences running concurrently. We affirm the trial court's judgment.

**Background**

A fifteen-year-old girl named Star[1] ran away from home and ended up living with a couple she knew as Nene and Roni. Nene and Roni told Star she needed to make money by having "dates," so they created a profile for Star on a website used by prostitutes. After Star refused to have sex with her first arranged "date," Nene and Roni took her to a store to meet Castoreno. Castoreno took Star to his apartment, where Castoreno, his girlfriend Rebecca, and Rebecca's sister and her boyfriend Aztec smoked methamphetamine. Later that evening, Castoreno and Rebecca had sex with Star in the apartment.

The next day, Castoreno took Star to the Sunset Inn motel. Castoreno paid for a room and took Star's clothes so she could not leave. Castoreno briefly left the motel room and returned with Aztec and two adult women. The adults smoked methamphetamine, and Castoreno told Star to smoke some as well in order to stay up and "last longer." Castoreno and Aztec left the motel room, and then a series of men arrived to have sex with Star. Star later told police she had sex with six or seven men as well as one of the women. Star spent the night in the motel room with Castoreno, Aztec, and one of the women, whom Star knew as "White Girl" but whose real name is Abigail McInnis.

In the morning, Castoreno returned Star's clothes and took her to McInnis's house. Castoreno left the house, and Star stayed behind with McInnis, who used drugs all day. In the evening, when McInnis was "really, really high" and "real dozy," Star borrowed her phone and used it to text a friend to meet her at H-E-B. Star told McInnis she needed to get clothes from her sister, and McInnis allowed Star to leave. Star ran from the house and was picked up by her friend's mother. Neither Star nor her friend's mother contacted the police.

---

[1] Not the minor victim's real name.

Several days later, Star and a friend were walking to H-E-B when Castoreno drove by, stopped, and turned around to follow them. Star and her friend went into a pawn shop to hide from Castoreno. Castoreno parked outside, and Rebecca entered the pawn shop, demanding to speak to Star. Castoreno then came into the pawn shop and forced Rebecca to leave with him. The pawn shop manager called the police. When the police arrived, Star identified Castoreno's vehicle, and police officers stopped the vehicle nearby and identified Castoreno and Rebecca as the vehicle's occupants. An officer drove Star in an unmarked vehicle to the street where McInnis lived, and Star identified McInnis's house.

McInnis testified at trial. McInnis knew Castoreno because he was her drug dealer. McInnis testified that on the evening of December 11, 2015, Castoreno picked up McInnis and took her to the Sunset Inn motel, where she met Star. Castoreno's friend Aztec, whom McInnis had met before, was also in the motel room. Castoreno told McInnis that Star was working for him as a prostitute and asked McInnis to coach Star and to take photographs of Star to use in online advertisements. However, McInnis testified Star did not seem like she needed any help, so McInnis barely spoke to her and did not take any photographs. McInnis smoked methamphetamine and then left the motel room with Castoreno to accompany him while he drove around town selling drugs. McInnis testified she and Castoreno returned to the motel room at around four or five in the morning, at which time Star reported she had not made any money because her customers thought she looked too young and left. Because Castoreno did not have enough money to pay for another night at the motel, McInnis, Castoreno, Star, and Aztec went to McInnis's house. When Castoreno and Aztec left the house, McInnis let Star use her cell phone so she could post ads and line up customers. Star told McInnis she was going to meet her aunt at H-E-B to get some clothes and then left the house and did not return. McInnis testified Castoreno was angry with her for allowing

Star to leave the house because he said he and "some people" had bought Star and he was planning to make money off of her.

In February 2016, San Antonio Police Detective Peter Sweeney knocked on McInnis's door and McInnis talked to him voluntarily. McInnis told Detective Sweeney that "[Castoreno] and [McInnis] and Aztec were engaging in prostitution with" Star, although McInnis testified she was not prostituting herself and did not tell Detective Sweeney that she was doing so. Detective Sweeney wrote in his report that McInnis told him: "I was there and we were prostituting."[2] McInnis testified Detective Sweeney said her "story matched up with [Star's], like, 90 percent." McInnis became nervous, however, when Detective Sweeney accused her of lying and threatened to arrest her for sex trafficking, so she told Detective Sweeney she would submit to a formal interview only after speaking to a lawyer. McInnis obtained a lawyer, signed a written statement, and agreed to testify at trial in exchange for immunity from prosecution.

Castoreno was charged with six counts of trafficking a child. Each count charged that Castoreno: "knowingly traffic[ked] [Star], a person who was younger than 18 years of age, and by any means caused [Star] to engage in, or become the victim of, conduct prohibited by Section 43.02 (Prostitution), Section 43.05 (Compelling Prostitution) or by Section 22.011 (Sexual Assault)." Counts one through three charged conduct taking place on December 11, 2015, and counts four through six charged conduct taking place on December 12, 2015. Following three days of testimony from nine witnesses, the jury convicted Castoreno of all six counts. Castoreno appeals.

---

[2] Detective Sweeney acknowledged he made some errors in his reports.

**Ineffective Assistance of Counsel**

In his first issue, Castoreno argues he received ineffective assistance of counsel at trial because his trial counsel failed to timely object to or request a remedy for the State's allegedly improper jury arguments.

## A.    Standard of review

To prevail on a claim of ineffective assistance of counsel, Castoreno must establish by a preponderance of the evidence that: (1) trial counsel's performance fell below an objective standard of reasonableness; and (2) Castoreno was prejudiced by trial counsel's defective performance. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To determine whether trial counsel's performance was deficient, we look to the totality of the representation and the particular circumstances of the case. *Id.* at 813.

Our review of trial counsel's performance is "highly deferential," and we indulge a "strong presumption" that trial counsel's conduct fell within a wide range of reasonable representation. *Id*. "To defeat the presumption of reasonable professional assistance, 'any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.'" *Id*. at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997)). Consequently, a direct appeal usually is an inadequate vehicle for raising a claim of ineffective assistance of counsel because the record is generally undeveloped as to why trial counsel did what he did. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Thompson*, 9 S.W.3d at 814 n.6 ("[I]n the vast majority of cases, the undeveloped record on direct appeal will be insufficient for an appellant to satisfy the dual prongs of *Strickland*."). Where, as here, the record is silent as to trial counsel's strategy, we will not conclude Castoreno received ineffective assistance of counsel unless the

challenged conduct was "'so outrageous that no competent attorney would have engaged in it.'"

*Goodspeed*, 187 S.W.3d at 392 (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App.

2001), *cert. denied*, 537 U.S. 1195 (2003)).

**B.     Analysis**

Castoreno argues his trial counsel was ineffective for failing to timely object to or secure a

remedy for allegedly improper statements the State made during its closing argument. First,

Castoreno argues the State improperly mischaracterized Abigail McInnis's testimony in the

following statement:

> [the State:] Now, the problem with Abigail McInnis is we know what she told [Detective] Pete[r] Sweeney when he went out there before there were any offers of immunity, before there were any threats of prosecution against her at all. When [Detective] Sweeney went out to her house and knocked on her door back in February of 2016 and said, hey, I'm investigating this case where this girl named Star was held at a motel and being pimped out, what do you know about it? And she gave that information. And you know, you heard it from her and you heard it from [Detective Sweeney]. She said, Yeah, we were prostituting that girl at the motel room. Chris Castoreno came and picked me up. He's my drug dealer. He came and picked me up and took me there because he knows I was engaging in prostitution at some point, and he wanted me to kind of teach her what to do; kind of give her advice on how to do that, and I did. But she didn't need to hear much from me. And she saw [Detective Sweeney]'s eyebrows go up, and go oh, maybe I've said too much.

The State continued discussing McInnis's testimony for another approximately 230 words before

Castoreno's trial counsel objected to the State's "mischaracterization of the evidence," arguing it

was not until McInnis provided her written statement that she first claimed Castoreno instructed

her to coach Star as a prostitute. The trial court responded: "The jury was here during the

testimony. The jury will remember all the evidence." Trial counsel continued strenuously urging

his objection, and the trial court again responded: "The jury will remember the evidence."

Castoreno argues trial counsel was ineffective for failing to make a timely objection, obtain

a ruling on the objection, or seek a mistrial or an instruction for the jury to disregard. Because trial

counsel objected very shortly after the State's allegedly improper argument and did so while the State was still discussing McInnis's testimony, we conclude trial counsel did not fail to make a timely objection. Further, even if the trial court's twice-made statement that "[t]he jury will remember the evidence" was not an implicit ruling on the objection, it certainly indicated the trial court was not willing to sustain the objection or entertain a request for a mistrial or other remedy. Trial counsel reasonably could have concluded any further objection or request would be overruled in front of the jury and that dropping the objection was the better trial strategy. Therefore, on this silent record, we presume counsel's conduct fell within the wide range of reasonable professional assistance. *See Goodspeed*, 187 S.W.3d at 392 (noting record on direct appeal usually is insufficient to determine whether counsel's performance was deficient).

Second, Castoreno argues the State improperly struck at him over the shoulders of his trial counsel in the following exchange, in which trial counsel was still objecting to the State's characterization of McInnis's testimony:

> [trial counsel]: Judge, it's a mischaracterization. [The State is] trying to point to it like it's there. It's not there. Read it word for word if you want to.

> [the State]: Any testimony you want to hear you can ask for it back.

> [trial counsel]: He's lying to the jury.

> [the State]: Your Honor—or, ladies and gentlemen of the jury, as a prosecutor, I have an obligation to do justice. [Trial counsel] has an obligation to fight for his client. He will fight for his client. He has no obligation to do justice.

> [trial counsel]: That's just baloney.

> [the State]: It's absolutely true.

Later in its closing argument, the State argued:

> [T]he defense attorney came in here to manufacture some story, well, it could have been this, right? It could have been that. This is what could have happened. The person who needed to do that or who should have done it if it were not true, was

Christopher Castoreno on December 18th, 2015, when he sat in that police office building . . . .

Trial counsel did not object to either statement.

Castoreno argues he was prejudiced by trial counsel's failure to object to the State's allegations that trial counsel "has no obligation to do justice" and "came in here to manufacture some story." If construed as accusations of bad faith, the State's allegations could be improper jury argument; however, whether to object to improper statements made during closing argument is frequently a matter of legitimate trial strategy. *Kuhn v. State*, 393 S.W.3d 519, 539 (Tex. App.—Austin 2013, pet. ref'd) (citing *Evans v. State*, 60 S.W.3d 269, 273 (Tex. App.—Amarillo 2001, pet. ref'd)). As a matter of strategy, trial counsel could have concluded that objecting to the State's arguments would do no more than draw attention to them. Therefore, on the silent record before us, we cannot conclude trial counsel's conduct was "so outrageous that no competent attorney would have engaged in it". *See Goodspeed*, 187 S.W.3d at 392. Because Castoreno has not demonstrated trial counsel's conduct fell below an objective standard of reasonableness, we overrule his first issue. *See Thompson*, 9 S.W.3d at 812.

## Jury Charge Error

In his second issue, Castoreno argues the trial court erred in failing to instruct the jury that it had to be unanimous as to the criminal conduct underlying each of the six counts of trafficking a child.

### A. Standard of review

We use a two-step process to review an alleged jury charge error. *Garcia v. State*, 486 S.W.3d 602, 608 (Tex. App.—San Antonio 2015, pet. ref'd) (citing *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc)). First, we determine whether error occurred. *Id.* (citing *Wooten v. State*, 400 S.W.3d 601,

606 (Tex. Crim. App. 2013)). If there is error, we determine whether sufficient harm resulted from the error to require reversal. *Id.* (citing *Wooten*, 400 S.W.3d at 606; *Ngo*, 175 S.W.3d at 744).

**B.      Egregious harm analysis**

Assuming without deciding the charge erroneously failed to instruct the jury that it must reach a unanimous verdict as to each separate count of trafficking a child, we turn to whether Castoreno has demonstrated sufficient harm.

Because Castoreno failed to object to charge error in the trial court, we will reverse the conviction only if he can demonstrate he suffered "egregious harm." *Garcia*, 486 S.W.3d at 609 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988)). "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Villareal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *see also Garcia*, 486 S.W.3d at 609. Egregious harm is a "high and difficult standard" to meet and must be both "borne out by the trial record" and "actual rather than theoretical." *Villareal*, 453 S.W.3d at 433 (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). To determine whether charge error has resulted in egregious harm, we consider: "(1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole." *Id.* (citing *Almanza*, 686 S.W.2d at 171). We apply each of these factors to the present case.

**i.      The entire jury charge**

The only mention of unanimity in the charge is the boilerplate language requiring the jury foreperson to certify the verdict "[a]fter [the jury] ha[s] reached a unanimous verdict." Therefore,

this factor weighs in favor of finding egregious harm. *See Arrington v. State*, 451 S.W.3d 834, 841 (Tex. Crim. App. 2015) (citation omitted) (holding first factor weighed in favor of egregious harm where unanimity was required but only mentioned once in boilerplate language regarding jury foreperson).

### ii.      The state of the evidence

Under this factor, we look to the record as a whole to determine whether the evidence made it more or less likely that the error in the jury charge caused Castoreno actual harm. *See id.* at 841–42. In cases in which the jury charge erroneously failed to instruct on unanimity but the defendant denied committing any of the alleged criminal acts, courts have concluded the state of the evidence weighs against a finding of egregious harm. For instance, in *Arrington*, after denying he had ever seen the child naked or had any sexual contact with her, the defendant was convicted of five counts of aggravated sexual assault of a child and one count of indecency with a child. *Id.* at 835, 842. The court of criminal appeals concluded the state of the evidence did not demonstrate egregious harm because the jury necessarily disbelieved the defendant's testimony; otherwise, the jury would have found him not guilty of all counts of sexual abuse. *Id.* at 842. Similarly, in *Ruiz*, the court of appeals held the state of the evidence weighed against finding egregious harm because the defendant argued he had committed none of the alleged acts supporting his conviction, as opposed to only some of the alleged acts. *Ruiz v. State*, 272 S.W.3d 819, 826–27 (Tex. App.—Austin 2008, no pet.).

Here, the state of the evidence weighs against a finding of egregious harm because Castoreno did not argue he committed only some, but not all, of the alleged acts of trafficking a child; rather, Castoreno argued he committed none of the alleged conduct and that Star was lying. If the jury had believed Castoreno's defense, it would have found him not guilty of all six counts of trafficking a child. Instead, by finding Castoreno guilty of all six counts, the jury necessarily

believed Star's testimony and disbelieved Castoreno's defensive evidence. Therefore, the state of the evidence in the entire record weighs against a finding of egregious harm.

### iii.     The parties' arguments

Under this factor, we consider whether any statements made by the State, the defense, or the trial court exacerbated or ameliorated the error in the charge. *Arrington*, 451 S.W.3d at 844 (citing *Ngo*, 175 S.W.3d at 750). Castoreno argues the State exacerbated the error in the charge by telling the jury during closing argument:

> So the basic elements of trafficking a child [are] . . . [a]nd that by any means the defendant caused her, [Star] to become the victim of conduct prohibited by Section 43.02 (Prostitution) or Section 43.05 (Compelling Prostitution), or Section 22.011 (Sexual Assault) of a Child. Now, the "or" is significant here, right, because you as jurors don't have to be unanimous on which of those offenses you believe she was the victim of. Six of you can believe she was the victim of compelling prostitution, six of you can believe she was the victim of sexual assault of a child. As long as the 12 of you agree that one of those is what she was the victim of, that's the count of trafficking.

The State was referring to the applicable statute, subsection (a)(7) of Texas Penal Code section 20A.02, which provides in pertinent part:

> A person commits an offense if the person knowingly: . . . traffics a child and by any means causes the trafficked child to engage in, or become the victim of, conduct prohibited by: . . . Section 43.02 (Prostitution); . . . Section 43.05 (Compelling Prostitution); . . . *or* Section 22.011 (Sexual Assault).

TEX. PENAL CODE ANN. § 20A.02(a)(7)(C), (E), (H) (emphasis added).

Although this court has not previously addressed unanimity with respect to subsection (a)(7), we have held human trafficking is a "result of conduct" offense, in which different types of results are considered separate offenses, while different types of conduct used to obtain a result are not. *Moreno v. State*, 413 S.W.3d 119, 127 (Tex. App.—San Antonio 2013, no pet.) (citing *Huffman v. State*, 267 S.W.3d 902, 907 (Tex. Crim. App. 2008)). In other words, the jurors need not agree as to the *means* by which the defendant trafficked the victim so long as they are

unanimous that the intended result occurred. For instance, in *Moreno*, we held there was no error in a jury charge in which the jury was permitted to return a guilty verdict under either subsection (a)(1) ("traffic[ing] another person with the intent that the trafficked person engaged in forced labor or services") or (a)(2) ("receiv[ing] a benefit from participating in a venture that involves an activity described by Subdivision (1)") because "each of the disjunctive portions of the application paragraph contained the single core criminal act of trafficking, with the same intended result that the trafficked person engage in forced labor or services." *Id.* (citing TEX. PENAL CODE ANN. § 20A.02(a)(1), (2)).

Similarly, under subsection (a)(7), the core criminal act consists of trafficking a child and "by any means" causing the child to engage in or become the victim of certain prohibited conduct. *See* TEX. PENAL CODE ANN. § 20A.02(a)(7). The statute's use of the disjunctive "or" between the different types of prohibited conduct (in this case, prostitution, compelling prostitution, or sexual assault) does not create different results, but rather merely establishes different means of trafficking a child. The jury was not required to be unanimous in its determination of which means Castoreno used, so long as all twelve jurors agreed Castoreno trafficked a child.

Therefore, the State correctly summarized the law in its closing argument and did not exacerbate any error in the charge regarding Castoreno's right to a unanimous verdict as to each separate *count* of trafficking a child. Because neither the State nor Castoreno told the jurors anything about this type of unanimity, this factor neither weighs for nor against a finding of egregious harm. *See Arrington,* 451 S.W.3d at 844 (holding factor neutral because "neither the State nor appellant told the jurors that they must be unanimous about which criminal episode constituted each offense, nor were they told that they need not be unanimous").

### iv.      Other relevant information

Castoreno argues the jury was confused by the charge, citing a jury note asking: "Does each count represent an individual? If not, what does each count represent?" In response to the note, the trial court advised the jury: "You have all the law before you. Please continue your deliberations." According to Castoreno, the jury's question demonstrates the jury was confused regarding unanimity. We disagree. The jury's question does not reference unanimity, and we cannot infer from the note alone that the jury was confused about whether it must be unanimous as to each offense charged. Accordingly, this information does not weigh for or against a finding of egregious harm.

### v.      Conclusion

While the first factor (the entire jury charge) weighs in favor of a finding of egregious harm, the second factor (the state of the evidence) weighs against a finding of egregious harm. Neither the third (the parties' arguments) nor the fourth (other relevant information) factor weighs in favor of a finding of egregious harm. Accordingly, we conclude any error in the jury charge did not cause Castoreno egregious harm. *See id.* at 845 (finding no egregious harm even though the first factor weighed in favor of a finding of egregious harm); *Cosio*, 353 S.W.3d at 777–78 (same). Castoreno's second issue is overruled.

## Conclusion

Because we overrule Castoreno's issues, the trial court's judgment is affirmed.

Sandee Bryan Marion, Chief Justice

DO NOT PUBLISH